JAB Energy Solutions v. Servicio Marina Superior. Good morning, Your Honor. Rob Kuig on behalf of the appellants along with Jeff Pastrak. May it please the Court. The issue in this case is relatively simple. It's whether a contract between sophisticated parties who choose to allocate risk between them in exchange for financial considerations have an agreement that means something or whether it's merely words on a page to be reinterpreted afterwards in light of the facts that come to bear. This case hinges on a contract that was entered into by these parties knowingly with advice involving sophisticated companies. There is not a scintilla of evidence in the record that the parties did not understand what they were doing when they entered into this contract. I want to ask you a question about that. Go ahead, Your Honor. If we were to assume arguendo that it was proper for JAB to go out and get this other boat and charge you for it, if we were to assume that arguendo, would you nonetheless be entitled to some sort of offset so that JAB overall ends up where it would have been had everything gone smoothly? Does that make any sense? I understand, I think, the question and I'm going to sound a bit facetious and I don't intend to. As I answer that hypothet, I also have to exclude the provision in the contract of a freightment that says you have no extra expenses and the novation or compromise in the bare boat charge. If I put all of that aside. I understand. But it seems to me that under the district court's judgment, JAB came out ahead. No question. And would it be your position that at worst for you, they should come out where they would have been had everything gone smoothly, i.e. you should get some sort of offset or some sort of consideration for the fact that you weren't paid your full contract? Correct. In fact, I should be paid for the use of my... And what is that math? If we're simply trying to put JAB where they would have been had everything gone smoothly, what would be their judgment against you? I know you don't think it should be anything. I get all that. But I'm just saying, what would it be? What's the math? I think I understand, and I'm hesitant to bind in any way, but I'm thinking they ultimately paid us, and I have to put in the fact that, and the judge never got to this incidentally, our counterclaim for the use of the vessel for the barge coming back. That was not in the decision. But basically, they agreed that they would pay us $5 million in round terms to take this barge with due dispatch to Malaysia. They paid us $2.5 million. And again, I'm using round numbers, when the vessel took off. The judgment was for, putting aside attorney's fees, it was for $4.5 or thereabouts. Okay. So you're saying it should have been, worst case for you, $2 million, because they should have credited the $2.5 million they would have had to pay anyway if everything had gone swimmingly, against this $4.5. Correct, but I want to be... I know you want to add to that and all that. I just want to get you that... No, I want to be fair with the court that I'm not sure that my math is correct because I don't see how the actual numerical numbers came to be. And the reason I say that, there is somewhere lingering in the back of my mind is that JAB was actually charged more than $4 million for the final part of the trip. And so the last thing I want to do is mislead you. Because that might have already happened. Correct. But in reading the judgment, it does not come there. So maybe do we need to remand for more findings on that? If we otherwise disagree with you and agree with them? At a minimum, I would like to get my cross-claim for the use of my vessel that they agreed to under the contract. And how is that different from this offset that we've just been discussing? This make-hold? Well, I think it would come into... In fact, when we did the bare-boat charter, we said that they would be entitled to some offset from the monies that they had previously paid us, but it went beyond that amount by some $250,000. But, Your Honor... I know you don't want to get there because you... Well, I don't mind getting there, but other than the obvious, that I don't think we need to. And that's what's confusing about a judgment like this. This is not some contract that you had of adhesion, as the judge at one point in his asking, he says, you know, under civil law, this is an adhesion contract. He talks about, at one point, who drafts the contract, and you'll see in his reasons for judgment that in determining the ambiguities, he says, you know, it has to be determined against SMS because they drafted the contract, when, in fact, three days before, on Exhibit 73 in your record, it shows the plaintiff and the appellee asking for changes in the indemnity language that we gave to them. So this result-oriented decision ignores all common instances of contract interpretation. The first step, which was never done in this, is look at the four corners of the contract. What does it say? And it says in two instances at a minimum that we will use due dispatch, but there is no guarantee of when that is or the time that it will arrive or how long the voyage will take or anything else. It says in two instances, under no circumstances will there be extra expenses to be paid if something goes wrong. It gives knock-for-knock provisions where each side basically takes care of their own. And then there's an integration clause that the court just totally ignored where both parties said, this is the document that controls the relationship between these two parties. And it's there. And the judge... So if you all gave them a latent defect vessel, they have no recourse. That's your argument. Well, they had recourse in advance. They accepted the vessel. And in the contract, they say when they accept it, it is a seaworthy vessel. They had an opportunity to do whatever inspections they wanted. They said that, or did you say that? No, the contract says... Did you guarantee it was a seaworthy vessel? What we said is that when we give it to you, it will be a seaworthy vessel. But when you accept it, you accept it as seaworthy because you have had the opportunity to inspect it and do whatever you want with it. The inspection was based upon representations from you? No, the inspection was not limited to representations by us. They had the right. Their ultimate customer had Noble Denton, which is a surveyor, go out there and do an inspection. They had the right to go look at the vessel. Nobody said, you have to depend on our representations. And incidentally, I know there's a parade of horribles that they have found where they claim that the vessel wasn't what they wanted it to be, but their own expert doesn't have any real problem with the vessel or how we handled it. His only problem was his calculation of fuel consumption as opposed to ours. At the end of the day, when you read his testimony... I mean, this thing is constantly being repaired from the day it leaves until they finally say, we've got to go get another vessel. Well, to give the other side their due, they did an excellent job of making it appear that way, but their own expert... I mean, look at the Air Force testimony in the record. What does he say his complaints are? Only about fuel consumption. But even if you assume, Your Honor, that this vessel had those problems, that's not our problem in the end of the day because they agreed to use this vessel. You understand that they had a right, and this gets to the very question you started with. Suppose they had hired another vessel. Suppose they had said, you know what, it's important to us that we have it there for a specific time because as the testimony came out, they knew that they had to have it there at a specific time or they faced liquidated damages, substantial liquidated damages. Nowhere did they put in a similar clause to us in why, and this is telling. They didn't want us to give them a date certain because they knew it would cost them more money. Why was your client contractually obligated to get the rig there with due dispatch? It was contractually obligated to get it there with due dispatch. Is it a fact question as to what is due dispatch? I think it's first a legal question, and the legal question is what is due dispatch, and it is reasonable effort. Now, the judge, however, started backwards on it, and he started to look at all of these things of what went wrong with the vessel and how could you do it in due dispatch. That's going at it wrongly. Due dispatch means we use, under the law, we use reasonable efforts to get the cargo there at the end of the voyage. We specifically disclaimed, not once but twice, that we would have it there at a certain time or that the voyage would last a certain length of time, anything like that. So you can't hold us to a certain time and say that's due dispatch. It is what is reasonable, and the case law, I believe, is fairly apparent. What it says is we have to use reasonable efforts. If the vessel breaks down, we need to go out there and fix it and move on. But unless I've guaranteed you that I'm going to be there on August the 1st, that's all it requires. How many breakdowns are you entitled to? Your Honor, I'm entitled to reasonably, let me use the worst case. Suppose the engines had fallen out, gone through the bottom of the vessel. I'd probably have to come up with another vessel and continue the voyage. But due dispatch does not get into, I mean, again, and it's confusing, I admit, but they accepted the vessel. They said it was seaworthy. We had certain issues along with it, and they did a masterful job of taking it. So does that mean there was a guarantee by you that it was seaworthy? Are you saying that that was waived once they said it was? Absolutely. And can that be waived? Absolutely. As a matter of contract law, and that's why I say. What's the point of your guarantee? Why even say that if it's just relying on their inspection? Why not say, as is, where is. You guys take it as it is and do your own inspection. We're making no warranties. What value is your warranty? Our warranty is that we're going to give it to you as we believe it to be seaworthy. But why does that have any value at all if they can't enforce that against you because once they take possession of the barge, which is the first time it matters whether it's seaworthy, you immediately say, on you, boy. Well, because, Your Honor, nobody said you had to take this vessel. We said we believe it to be seaworthy. I thought the warranty was it is. It is. I'm sorry. It is. No question. It is seaworthy. And you have the right to ascertain whether it's seaworthy in your judgment because once you take it out, it's on you. You have determined it's seaworthy. That's in the contract as well? Yes, sir. What is the value? To me, I don't understand the value of your guarantee. As long as this pad of paper is in my hands, it's great. As soon as I hand it to you, it's worth nothing. And that's what I'm warranting to you, that it's great as long as I'm holding it, where you can make no use of it. Your Honor, if I'm going to take that pad from you, while you have it and you have on there, it's got some value. I give you $10 for it, I get it. We've had an exchange of goods and services. That's what it's about. You and I freely negotiating for the value of your pad. I may look at it and say, she's wrong, it wasn't worth it. But after the fact, I can't say, oh, I should have looked at this beforehand and done that. There's only one purpose to this bargain, and that's to go somewhere. And so if you're saying it can go somewhere, but nah, nah, nah, as soon as you start to try to take it somewhere, our promise isn't worth anything. I don't understand the value of the promise. I still have a promise there. I say I will bring it with due dispatch. And in due dispatch, it means I will endeavor to make sure that it gets there, I will make the corrections that are necessary to get there, and I will get it there. So then where did this break down? Not literally, but figuratively. This is rocking along and going from port to port needing constant repairs. At least that's what the judge found in the facts. And so when is it that they can finally say, you know, this is a lemon, it isn't any due dispatch, we're done? How long do they have to keep letting you show up and mess around and, you know, talk to the engine before they finally have to say, you know, this just isn't going to happen? Two responses. The first, they need to do that before they enter into this contract. In much the same way that they agreed with their ultimate ‑‑ Yes, ma'am. When they entered into their contract with their customer, they guaranteed that they would have it there. They say in their testimony in the record, we knew that if we told SMS that it had to be there by a certain time, it would cost us more money. So at that point, they made the decision to take the risk on themselves that we would get it there using due dispatch. Now, to get to the second part, the more factual one, it has these issues. And, again, I recommend that you read their own expert because the issues are not out of the realm for a vessel at sea going halfway around the world. Admittedly, they saw some things, they had some issues, but none of those kept the voyage from continuing to proceed. The only reason it turned around is because the customer, at the end of the day, said, we're concerned about your vessel. We want you to turn around. We said, no, we can make the journey. They chose to substitute their own judgment, not by some expert who comes in after the fact, but by somebody who admittedly said, I've never done this before, on the back of an envelope, and he says, I don't think you'll have enough fuel. But then, when you read the testimony, it's, you won't have enough fuel not to stop again. And it all came down to what is due dispatch. I'm sorry, I see I've run through my time. Thank you. Good morning, Your Honors. My name is Robert Lemon of the Jones-Walker Firm, assisted by my partner, Brady Early. We represent Pele JAB. Let me first address the issue about the damages. Under the contract of freight, we were supposed to pay lump sum freight of $5 million to get it from Amelia, Louisiana, to the Malaysian drill site. In connection with that, it required an initial non-refundable payment of half of that, $2.5 million. So we paid the $2.5 million. We never got past one or two days out of Panama, and it constantly broke down. So what did you pay for the replacement barge? Four point, not barge, the tug. Well, whatever. For the tug to get to Malaysia and get back, bring the barge back to Fushun, $4.8 million and some change. And that's what the judge awarded you, so it seems to me you came out ahead, $2.5 million, on what you would have had, had everything gone smoothly and swimmingly. No, Your Honor, we never got the $2.5 million back. No, what I'm saying is, in your head, when your client entered into this contract, they're thinking, we're going to pay $5 million, and we're going to get from point A to point B. Then things broke down, and they had to go get this replacement tug. So they had to pay $4.8 million. And the judge gives them that back. Let's say that judgment gets paid. Now, instead of having, and they got it from point A to point B, instead of being out a total of $5 million, they're out a total of $2.5 million, because that's what they paid, the nonrefundable fee. They got the $4.8 was a net-net, and they never paid the other $2.5. How is that? We also had to pay for the tug to get back to Fushun. We also had to pay charter hire on the barge. And what was all that? I don't know the total sum. I know that they claimed that the balance due was $2. But doesn't that matter? Because you have the right to be made whole, assuming all the other, you know, assuming the first four or five issues in your favor. You have a right to be made whole, but you don't have a right to profit from this. And it seems to me that you profited because the judge is giving you back the extra money you paid, and you never paid the full amount of the contract you thought you were going to have to pay. We didn't profit. We still had to pay that money to get there. We ended up paying $4.8 million plus $2.5 million. Right. Plus whatever the extra. But the judge is giving you $4.8 of that. And you should have had to pay. Had everything gone the way you planned, you would have paid $5. It seems to me you paid $2.5. Show me where my math is wrong. Assuming that the judgment gets paid. Okay. Assume that argument. I just don't agree with that. We had to go out so we wouldn't be adrift or remaining. You would have paid $5 million. We would have paid $5 million to get there. Get there and back. And you ended up paying $7.3 million in total. Okay. And the judgment gives you $4.8. So it seems like if you reconcile all that, you did come out $2.5 million ahead. But the only tug that was available was a bigger tug and more expensive, and we had to pay for that. Right. Plus $4.8 million. Right. But your contract damages are the difference between what you would have paid had they satisfied the contract and what you actually paid. And you actually paid, what, $7.3 million. $2.5 plus $4.8, whatever that is. Yeah, but the $4.8 is a net if they pay the judgment. So you still haven't paid what you thought you would have paid going forward, and you haven't shown me otherwise. And so what I'm saying is why shouldn't the judge at least have to explain why that $2.5 million isn't credited against the $4.8? You actually paid $7.3 million. Whereas had everything gone correctly, you would have paid $5. The difference between $7.3 and $5 is $2.3 million. It would have all gone the same for $5 if we had been able to get the same kind of tug. But the only tug available was this larger tug, more expensive tug, and it cost $4.8 million. I don't care if it cost $10. You don't have an answer is really how this is coming. So I'm going to give you one more chance. No, I'm not. You have an answer, and if you don't, we'll move on to my next question. I don't. All right. So my next question has to do with the alter ego issue. What fraud did SMS and Cashman commit in connection with their relationship with each other? SMS was supposed to have its own management. The senior manager of SMS was a guy named Cal Thibodeau, who was the manager of marine operations in Morgan City. He testified he made no decisions. He wasn't allowed to make any decisions regarding this project. His job was to see to it was provisioned and crewed. And he didn't even conduct a – he hired the master and the chief engineer, but he didn't meet with him to prepare him for the voyage, give him the voyage plan or anything. He didn't do anything. Well, what I'm trying to get at is typically in a contract situation, alter ego is very difficult to get because the fact that a parent controls a subsidiary isn't good enough because in contracting with the subsidiary, you knew you were contracting with SMS and not Cashman. If you wanted Cashman to guarantee it, you should have asked them to sign off on it, right? And so the law doesn't allow you to just get Cashman just because Cashman controls SMS. That's not that atypical with a parent and subsidiary. You've got to have that something more. Where is the something more? It's Cashman that came to us. We did the voyage plan with Cashman. It was Cashman that said they could do these things. It was Cashman that sent the emails. Okay, so let me come at it this way. What record evidence do you have that JAB thought they had a contract with Cashman and Cashman deceived them into contracting with SMS if they didn't know that SMS was a subsidiary that they were contracting with? We thought we had a contract with both, but there's emails that show that they substituted SMS for Cashman because the emails say SMS was the registered owner of the tug. Okay, so they knew they were contracting. When the contract was signed, they knew it was JAB and SMS, and SMS is a subsidiary of Cashman, right? Okay. Okay, and so why don't we simply follow that? Because all we know is it meant to get you guarantors you didn't get. Well, the guarantees in these emails, the March 1st emails, were made by the project engineer for Cashman. He didn't work for SMS. He was for Cashman. His authority, he had to get it from Jamie Cashman, the president of Cashman. The contract was negotiated by the general counsel of Cashman. He's on his own fraud. That's fine. My question, or his own misstatement or whatever, my question is why you are entitled to alter ego recovery. That's a specific category of recovery. Because all of the decisions made for the operation of this tug, including selecting the tug, the prices for the contract, who was going to be on it, where it would go, the operational management was all made by Cashman, not SMS. It's not the case for the proposition that control alone by a parent of a subsidiary is enough for alter ego recovery in a context like this. Well, it's enough to make Cashman responsible for his own negligent or gross negligent acts and his own fraud. Okay, that's not alter ego. If I'm driving a company van and I get in a wreck, it didn't alter ego for me to be liable for my own wreck. Okay, so what evidence is there to support alter ego? Cashman knew that the tug had problems before it was ever supplied. In January of 2012, the then-captain of the tug was complaining about fuel consumption and not being able to figure out fuel capacity, and there were all sorts of problems there. It came in, the vessel remained idle. Dickie Torbett, a Cashman employee, had selected another tug for the job, and Jamie Cashman, the president, said, no, we're going to use the Atlas because it hasn't any work. Let me ask you about fuel consumption. JAB didn't have to pay for fuel. Whatever the fuel cost was, that was... But whether the tug could complete the job as represented depended on its fuel. How many days behind they were not on the fuel consumption, right? Because whatever the fuel consumption was, that came out of not JAB's pocket, but the... The fuel consumption was an issue whether they could make it or not. Okay, but, right. And if they have, if their tanks say 165... How far behind were they? It never got there. I know that the eight-day trip from, the supposedly eight-day trip from Amelia to Panama took 21 days, and whereas it was supposed to be 32,000 and some change fuel consumption, it was like 68,000 gallons, because they were running in excess of their $4,000-a-day fuel consumption, even though sometimes they were running slow speeds, sometimes... Any expert testimony about whether they could ever have gotten there on this tug, and if so, how long it would have taken? Our expert was hired to deal with the due dispatch, and he said they didn't have the fuel capacity and were using up too much fuel consumption to make it there, because the representation is we would stop only in Panama. By the time they got, by the time they had, you went and got another tug, due dispatch was out the window, because there was no prospect of them making the trip. Couldn't do it. They kept breaking down, and they were running on one engine, and they had repaired it in Progreso, Mexico, then they had repaired it in Panama, and they had just fueled up in Panama and left, and that night they're on one engine again. They wouldn't make it, and their expert came out with that we could rely on favorable currents to make it. Well, that's silly, and that's what our expert said. They didn't have the ability to make it to Honolulu, let alone make it to Singapore. Did you waive your warranty of seaworthiness by inspecting the tugboat and accepting it? 3A provides the warranty, and then 4B says we will inspect it. All that inspection is modified by Mr. Saunders' narrative section, page 2 and page 3 of the contract, where he says they have a suitability survey of the tug and barge, but only the survey of the barge is conclusive evidence. It goes on and on about you accept the barge in whatever condition, whatever condition the suitability survey is, and it's conclusive evidence and you can't come back and complain later. Nothing about that on the tug. The tug has an absolute warranty, and that's what it says. They will tender vessels to the shipper in a seaworthy condition. On alternate theories, we don't have to reach that theory to decide that the district court found breach of contract under due dispatch, so we don't have to get to the seaworthiness issue, do we? Probably not, but it's a result of the unseaworthiness that it couldn't do the due dispatch. The two warranties go hand in hand. It breached the due dispatch warranty because it couldn't make the speed. It couldn't complete the job. It kept breaking down. Let me be clear about this. Can we only uphold the judgment in your favor if we find that the district court was right both about seaworthiness and due dispatch? Either or. You win? Okay. I can win on both of them, and I believe I do win on both of them. But if you don't win on seaworthiness, do you still prevail on due dispatch? Yes, and I believe I win on seaworthiness because there's no express disclaimer. The cases say the disclaimer has to be strictly construed. It's got to be concise, clear, and unambiguous. It's got to have a seaworthiness. What is the value of your duty of inspection? What benefit do they get out of that? We provide a marine warranty surveyor to go out and look at the tug and determine whether it's fit to go based on an external inspection with the cashman and SMS people in attendance, by the way, and Mr. Schwab testified that he didn't see anything wrong. It's what an external inspection will show, plus the warranty surveyor said based on this external inspection and based on what you, the owner, have told, represented to me, the vessel is fit to go. But they knew there were problems, and when the vessel starts on its voyage they see all this black smoke coming out, and they let it go. The second day into the trip they've got to go slow speed. The third day of the trip their incompetent chief engineer shuts the whole thing down, breaks the starboard engine, and they report that the number one port generator is out, and then the captain's complaining why they're trying to get to Progresso. The navigational instrument panel isn't working, and each day it was another problem and another problem and another problem, and then slow speeds because the captain is afraid it will happen again. So this is something that, again, it goes back to the due dispatch. They gave us a vessel that wasn't up to speed, to say the least, but because of that would never make the trip. And nowhere in this contract did we waive anything. I believe I've said everything out in my brief, laid out the evidence, as did the judge, cited to the testimony, cited to the exhibits. Did the bare boat charter have any effect on the original contract? It just took the barge out, and to continue to use the barge, we had to do it pursuant to a barge bare boat charter. It had nothing to do with the tug. So we didn't release any rights against the tug. So the contract was still binding? The contract was terminated, and we entered into a new contract for the use of the barge, bare boat charter, daily charter hire, or weekly charter hire, I think it was daily, for the rest of the trip and then the trip back. But we didn't waive any rights. We didn't release any rights. It had nothing to do with it, the tug. Nobody asked us to release any rights. Thank you very much, Your Honor. Thank you, Your Honor. Let me try and address a couple of things that came up.  This is a direct quote from the transcript of the court and counsel for JAB. I know that my question was about representations or even misrepresentations, but you don't accuse them of fraud, right? Answer, no, I did not. There is no allegation of fraud in either the pleadings or in the case. I could go on, because I'd like to argue and tell you that there's no factual basis either. If we were to reverse the alter ego finding for lack of evidence of fraud, would there be anything left against Cashman, even assuming everything else is affirmed as to SMS? I don't believe so. So there wasn't any independent theory of liability against Cashman  Correct. The second thing that counsel brought up was this issue of fuel capacity and these issues of the, you heard it again, and this is how the trial transcript reads, constant problems with the vessel. This is a maritime venture that's going around the world. They selected, and they had every right to enter into a contract with whomever they chose to do this. They negotiated the contract, and when they did it, they had a right to come in and inspect it. There was no limitation on anything that they could do. Let's set aside the warranty of seaworthiness. Okay. You have said that you did, irrespective of that, you did have the obligation to get the rig there with due dispatch. Yes, ma'am. And that involves some factual determination, reasonable. You said it's what's reasonable, and that's a factual determination. It is. So we've got the district judge's findings that by the time the changeout was made in the tugs, it was clear that the cargo was not going to get there with due dispatch. Well, and I will agree with you that, first, you have to read that contract, and that's for you all to read de novo whether or not you even get there. But let's assume we get there, and there is the issue of due dispatch, and it's a reasonable inquiry. What the court did wasn't look at the contract first and say, is it ambiguous as to, you know, what do the parties mean by due dispatch? Because if he had, he would have looked directly into the contract of a freightman that says, and spells out particularly, carrier makes no warranty or representation as to a specific arrival date at the port in Malaysia. Okay. Due dispatch doesn't mean a year or two years from now. No. It means reasonable efforts. Reasonable efforts is a fact question. It is. Okay. Tell me how the district court erred in concluding that they were so far behind at the point that the change in tugs occurred, that there were reasonable efforts aside, it couldn't be due dispatch. First, he did what everybody is tempted to do, which is to start backwards. When was it going to get there? That's not an inquiry. Due dispatch is, am I using reasonable efforts to get there? You could use reasonable efforts for three years to repair the tug, but at some point that's not due. At some point that's not. So tell us where the district court clearly erred in saying this was not due dispatch. When he allowed JAB to substitute its judgment as to whether or not this vessel, this judgment unsupported by any experts at the time, that this barge was not going to get to Malaysia. It was going into it at slow speed, right? It was going in to have a relatively simple repair, but it was moving forward. In fact, when they turned it around, and I believe you asked the question how far behind was it, it was 14 days, not 22 as they suggest. It was moving forward. We were prepared to go forward and get more fuel to do some minor repairs. What estimate was there, if any, about when you got to Malaysia with the original tug? There is nothing in the record to reflect either way. Right. And, in fact, their expert, the only ultimate opinion he gets about whether or not this vessel could have made it is it would have had to stop more times. Therefore, there would have been some more time going on. They would have had to stop more times because? He believed that the fuel consumption was such that you would have had to take on more fuel. But he made no estimate as to how many days, how many hours that would take. And the final part, and I see, Your Honor, the red light, but the reason that the court has to get to all these ambiguities is it's the only way it can write out there is no extra expense because you caught it early on. This is, in effect, a $7.5 million trip that they only want to pay $2.5 million for, not even the $5 million that they bargained for. If they had wanted a date certain, they could have hired a vessel that would have guaranteed a date certain and had those penalties in it. Instead, what they want to do is come in after the fact, complain about, well, the vessel wasn't what we wanted it to be. It might not have gotten there within two weeks, three weeks, four weeks of when we wanted it to be there, even though not once but twice they said specifically. They agreed that there was no warranty or representation about a specific arrival date. That's why I started this with this is about a contract between sophisticated parties who allocate risk. Does it mean anything or not? Thank you very much. The court will be in recess.